UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH EIESS,<br><br>Plaintiff,<br><br>v.<br><br>USAA FEDERAL SAVINGS BANK,<br><br>Defendant. | Case No. 19-cv-00108-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 32 |

Plaintiff Elizabeth Eiess has filed a putative class action against Defendant USAA Federal Savings Bank ("USAA"), alleging that she is a customer of USAA and that USAA has improperly assessed fees against her and others similarly situated. Ms. Eiess has asserted claims for breach of contract and unjust enrichment, as well as violation of California consumer protection laws. USAA has moved to compel the entirety of the case to arbitration. Arbitration, if it were to go forward, would be on an individual basis only – *i.e.*, Ms. Eiess could not proceed with any class claims.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part USAA's motion to compel arbitration.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      First Amended Complaint ("FAC")

In the operative first amended complaint ("FAC"), Ms. Eiess alleges as follows.

Ms. Eiess is a customer of USAA and maintains a checking account with the bank. *See* FAC ¶ 13. Since 2014, she has resided in California. *See* FAC ¶ 20.

In October 2018, she tried to use funds in her USAA checking account to pay for a credit

card bill (in the amount of $358.83). *See* FAC ¶ 21. "USAA rejected payment of that transaction due to insufficient funds and charged [her] a $29 NSF [non-sufficient funds] Fee for doing so." FAC ¶ 22. "Three days later, . . . the same transaction was submitted for payment again" – (presumably, by the credit card company), but USAA again rejected the transaction due to insufficient funds and charged Ms. Eiess a second NSF Fee of $29. FAC ¶ 23. Five days later, the same transaction was submitted for payment, and USAA charged Ms. Eiess a third NSF Fee of $29 based on insufficient funds. *See* FAC ¶ 25. In short, "USAA charged [Ms. Eiess] $87 in fees to attempt to process a single $358.85 payment." FAC ¶ 27 (emphasis omitted).

According to Ms. Eiess, by charging multiple NSF Fees for only one transaction, USAA has breached the terms of contracts that exist between them – namely, a Deposit Agreement, an Online Banking Agreement, and a Fee Schedule. Ms. Eiess maintains that these documents expressly state that USAA will charge only one NSF Fee per single transaction. Ms. Eiess further asserts that, because the above documents are publicly available, members of the public who consider opening a checking account with USAA will be misled by its representations that it only charges one NSF Fee per transaction.[1]

Based on, *inter alia*, the above allegations, Ms. Eiess brings a claim for breach of contract or, in the alternative, unjust enrichment. Ms. Eiess also brings two statutory claims – *i.e.*, a claim for violation of California Business & Professions Code § 17200 and a claim for violation of the California Consumer Legal Remedies Act ("CLRA"). Ms. Eiess seeks to bring all claims as class claims. For the statutory claims, part of the relief sought is injunctive in nature; in particular, Ms. Eiess seeks an order preventing USAA from misrepresenting its NSF Fee policy in its publicly available documents.

B.    Arbitration Agreement

In response to Ms. Eiess's lawsuit, USAA has moved to compel arbitration of all of her causes of action, both common law and statutory. USAA notes that there is an arbitration clause contained in the Deposit Agreement between the parties. *See* FAC, Ex. A (Deposit Agreement).

---

[1] Apparently, only certain members of the general public may open accounts with USAA – namely active or former members of the military and eligible relatives. *See* Mot. 11 n.7.

2

If USAA is successful in compelling arbitration, then, by the terms of the arbitration provision, Ms. Eiess may not proceed with any class claims and instead is limited to resolution of her individual claims only.

The arbitration clause provides, in relevant part, as follows:

> ### Resolution of Disputes and Claims
> Any Covered Claim, upon election by either you or FSB, shall be resolved by arbitration according to the terms of this Arbitration section. . . . Covered Claims subject to arbitration, include without limitations (a) those based in contract; tort; state or federal statutes, regulations or ordinances; state or federal common law; state or federal constitutional law; and (b) those seeking any form of equitable relief or money damages
>
> ### Claims Covered by Arbitration
> A Covered Claim is (without limitation) any pre-existing, present, or future dispute, claim, or controversy that in any way arises out of or relates to:
>
> \*    \*    \*
>
> - The account or account disclosures, including for example any application, advertisement, disclosure, promotion, or oral or written statement related to the account, or the establishment, operation, or termination of your account, whether occurring or made before your account was opened or after it was closed or terminated.
> - A payment (or returned payment) or credit (or the failure to provide a credit).
>
> \*    \*    \*
>
> ### Class Action Limitations
> **The arbitrator shall be restricted to resolving only the Covered Claims between you and FSB. Unless you and FSB both consent in writing, the arbitrator shall NOT have the authority to conduct any class-wide arbitration proceedings. The arbitrator may not consolidate or join together any Covered Claims you and FSB have against each other with any claims or disputes you or FSB may have with other persons or account holders, unless you and FSB both consent in writing. You may not pursue any type of collective action or class action against FSB in court or in arbitration. You will not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Covered Claim as to which arbitration has been elected. If one or more of the above limitations on proceedings and other rights is deemed to be unenforceable or interpreted to not prevent a collective or class action, then such collective or class action shall proceed in a court of law and not in arbitration.**

FAC, Ex. A (Deposit Agreement at 31-33) (emphasis in original).

Also included in the arbitration clause is a provision that restricts the arbitrator's ability to award public (as opposed to private) injunctive relief.

> ***Limitation of Arbitrator's Authority***
> The arbitrator may award any damages or other relief permitted by applicable substantive law, including punitive damages. . . . The arbitrator may award injunctive or declaratory relief that would benefit you or FSB, but the arbitrator may not award injunctive or declaratory relief for the benefit of others who are not named parties to the arbitration proceedings.

FAC, Ex. A (Deposit Agreement at 33). Because the arbitration clause requires covered claims to be arbitrated rather than litigated, and then bars an arbitrator from awarding public injunctive relief, the clause effectively provides that a USAA customer waives the ability to seek public injunctive relief in any forum, whether judicial or arbitral. USAA does not dispute such. USAA also does not dispute that, under California law, a waiver of public injunctive relief in any forum is not enforceable, *see McGill v. Citibank N.A.*, 2 Cal. 5th 945 (2017), and that, under Ninth Circuit law, the "*McGill* rule" is a generally applicable contract defense that is not preempted by the Federal Arbitration Act ("FAA"). *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 830-31 (9th Cir. 2019).

## II.     DISCUSSION

### A.     Legal Standard

The parties agree that the FAA applies with respect to their dispute over whether Ms. Eiess's causes of action should be compelled to arbitration. Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The final clause of § 2, its saving clause, permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432 (9th Cir. 2015) (internal quotation marks omitted).

### B.     Contract Formation

Initially, the parties' focus largely seemed to be on the *McGill* rule and whether it was

preempted by the FAA; however, with Ms. Eiess's sur-reply and then oral argument at the hearing on the motion to compel, other issues came to the forefront, including the issue of whether a contract had ever formed between Ms. Eiess and USAA because the Deposit Agreement contained the following "unilateral modification" provision.

> ***Changes to Agreement***
> *FSB may change this Agreement at any time, whether by adding new terms and conditions, or deleting or amending existing ones.* FSB will generally send advance notice of an adverse change by mailing, e-mailing, or delivering a notice, a statement message, or an amended Agreement to the last address (location or e-mail) on file for you. In some cases, FSB may amend the Agreement without prior notice by posting information on usaa.com or otherwise making it available to you. If you do not agree with a change, you may close your account. However, if you continue to use your account or keep it open, you accept and agree to the change. The current version of this Agreement supersedes all prior versions and contains the terms governing your account.

FAC, Ex. A (Deposit Agreement at 5) (emphasis added). According to Ms. Eiess, the unilateral modification provision renders the entire Deposit Agreement an illusory contract lacking in consideration because, based on that provision, USAA would be able to retroactively apply contract changes to a customer's claim that had already accrued and thus deprive the customer of the benefits of the contract.

    1.    <u>Delegability of Contract Formation Issue to Arbitrator</u>

"Gateway" questions of arbitrability are typically for a court, and not the arbitrator, to decide, even where there is a facial agreement to arbitrate. *See Portland GE v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017) (stating that gateway questions of arbitrability "are presumptively reserved for the court"). Gateway questions include "'whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy.'" *Id.* Notwithstanding the presumption of judicial determination, "parties may delegate the adjudication of gateway issues to the arbitrator if they 'clearly and unmistakably' agree to do so." *Id.*

The issue of contract formation, however, is not a delegable gateway issue. The fundamental threshold question of whether there *exists* a binding contract (of which an arbitration clause is a part) cannot be delegated because it cannot be assumed that a delegation clause

contained therein must be given effect. In other words, if a contract contains a delegation clause, that delegation clause may be given effect only where the contract has been formed in the first instance. *See King v. AxleHire, Inc.*, No. 18-cv-01621-JD, 2019 U.S. Dist. LEXIS 72861, at *6 (N.D. Cal. Apr. 30, 2019) (stating that "[r]eliance on a delegation clause assumes a binding contract was formed, which simply elides the issue in dispute here"). The question of contract formation is for the court. As the Ninth Circuit said in *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979 (9th Cir. 2017), "[a]lthough challenges to the *validity* of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very *existence* of the contract are, in general, properly directed to the court." *Id.* at 983 (emphasis added)[2]; *see also Galilea, LLC v. AGCS Mar. Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018) (stating the same).[3]

In the instant case, USAA argues that whether Ms. Eiess's challenge to the unilateral modification provision is considered an issue of contract formation (as Ms. Eiess contends) or contract validity (as USAA contends), those gateway issues of arbitrability have clearly and unmistakably been delegated to the arbitrator to decide. USAA notes that the Deposit Agreement provides as follows: (1) all arbitrations will be conducted by either JAMS or AAA, *see* FAC, Ex. A (Deposit Agreement at 32); (2) the arbitrator must follow the administrator's "Arbitration Rules in effect at the time of the arbitration," FAC, Ex. A (Deposit Agreement at 33); and (3) both JAMS and AAA's arbitration rules include a rule stating that disputes over contract formation and validity shall be decided by the arbitrator. *See, e.g.*, JAMS Comprehensive Arbitration Rules & Procedures, Rule 11(b) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a

---

[2] Although the Ninth Circuit in *Kum Tat* stated that, "in general," a court (and not an arbitrator) should decide a challenge to the existence of a contract, the Ninth Circuit did not identify any specific exception where it would be appropriate for an arbitrator (and not a court) to make that decision.

[3] Question of contract formation is different from question about validity of the contract. The latter, which includes questions about, *e.g.*, unconscionability, may be subject to arbitration. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006).

preliminary matter."); AAA, Consumer Arbitration Rules, Rule 14(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."); AAA, Consumer Arbitration Rules, Rule 14(b) ("The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.").[4]

As indicated above, USAA's contention that contract formation (as opposed to contract validity) can be delegated is incorrect. Here, Ms. Eiess challenges contract formation, not contract validity. Admittedly, the issue of illusoriness can in some circumstances be characterized as a contract validity issue where contract formation is not challenged. *See Arnold v. HomeAway, Inc.*, 890 F.3d 546, 550-51 (5th Cir. 2018) (noting that, "[o]n its surface, an illusoriness challenge would appear to be in the nature of an existence challenge" as "illusory promises imply lack of adequate consideration, which affects contract formation"; however, in the case under consideration, the plaintiff did "not dispute the existence of a contract with [defendant]" but rather simply asserted that the arbitration provision specifically was "an illusory promise on [the defendant's] part" and thus the plaintiff's argument was "in the nature of a validity challenge"). But in the case at bar, it is clear that Ms. Eiess does dispute the existence of the entire contract because of the unilateral modification provision; that is, she is *not* conceding the existence of the contract and limiting her challenge to one illusory promise contained within the agreement. She contends the illusory nature vitiates consideration essential to contract formation. That being the case, the dispute between the parties concerns contract formation, and not validity.[5] The question

---

[4] Ms. Eiess is correct that the Deposit Agreement does not specify which exact rules of JAMS or AAA should apply. However, it appears that all of the rules contain a provision comparable to those cited above.

[5] Although the Court is citing *Arnold* in support of the general proposition above, it is not holding that Texas law governs the contract formation/validity issue – *i.e.*, based on the choice-of-law provision in the Deposit Agreement. *See* FAC, Ex. A (Deposit Agreement at 5) ("Your account and this Agreement shall be governed by federal laws and . . . by the laws of the state of Texas.").

therefore is one for the Court, not the arbitrator.

2.      Choice of Law on Contract Formation

Having determined that Ms. Eiess is contesting contract formation, the Court now must decide what law should apply in evaluating the issue of contract formation. "Where [as here] the underlying basis for CAFA jurisdiction is diversity, the forum state's choice of law rules apply." *Wright v. Linebarger Googan Blair & Sampson, Ltd. Liab. P'ship*, 782 F. Supp. 2d 593, 601 (W.D. Tenn. 2011); *see also Kaufman v. Am. Express Travel Related Servs. Co.*, No. 07 C 1707, 2008 U.S. Dist. LEXIS 18129, at *10 (N.D. Ill. Mar. 7, 2008) (noting that "[t]he case was removed pursuant to CAFA, which is part of the diversity jurisdiction statute" and "[a] district court applies the choice of law rules of the state in which it sits in a diversity case"; therefore, applying "the choice-of-law rules of Illinois, the forum state, to determine which state law applies to the issue of contract formation").

In California, absent a controlling choice-of-law agreement, choice of law is determined by a "governmental interest" analysis.[6] *See Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 915 (2001).

> In brief outline, the governmental interest approach generally involves three steps. First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

---

The Court cannot apply the choice-of-law provision in the Deposit Agreement because that presupposes that a contract has been formed in the first place. *Cf. Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) (stating that, "[b]efore we can determine the validity of the United States choice of law provision in the contract . . . , we need to figure out which country's law controls the issue of contract formation"). The issue of what state's law is applicable to the contract formation issue is addressed below.

[6] As stated above in note 5, the Court does not consider the Deposit Agreement's choice-of-law provision here because doing so would presuppose the existence of a formed contract, the very issue before the Court.

United States District Court
Northern District of California

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-108 (2006).

As noted above, the first step in the governmental analysis test requires this Court to consider whether the laws of the states at issue are the same or different. There is a material difference if application of the states' laws leads to different results. *See Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal. App. 4th 637, 645 (1993) (stating that "there is a true conflict of laws here because the substantive law of California leads to a different result than the substantive law of Wisconsin"); *see also McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 88-90 (2010) (concluding that the laws of Oklahoma and California differ because, under Oklahoma law, the plaintiff's action would be untimely but under California law, the action would be timely).

In the instant case, the Court considers only the laws of California and Texas, as those are the only states' laws that the parties have put at issue. As to whether California law and Texas law are the same or different, the Court must focus on the particular issue in question – *i.e.*, whether a unilateral modification provision in a contract means that the contract is an illusory agreement such that a contract was never formed in the first place.

In California, "it has long been the rule that a provision in an agreement permitting one party to modify contract terms does not, standing alone, render a contract illusory" because of the implied covenant of good faith and fair dealing implicit in every contract – *i.e.*, under the implied covenant, the party with the authority to modify "may not change the agreement in such a manner as to frustrate the purpose of the contract." *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 706 (2013); *see also Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373, 389 (2016); *Asmus v. Pac. Bell*, 23 Cal. 4th 1, 16 (2000) (noting that "an unqualified right to modify . . . the contract is not enforceable[,] [b]ut the fact that one party reserves the implied power to . . . modify a unilateral contract is not fatal to its enforcement if the exercise of the power is subject to limitations, such as fairness and reasonable notice"). Thus, even if the contract were construed to permit retroactive modification, the implied covenant prevents the party with the unilateral authority from retroactively modifying the contract to deprive the other party of the benefits of the contract. *Compare Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1465 (2012) (noting that the implied covenant can, in effect, save a unilateral modification provision unless,

9

1    *e.g.*, the unilateral modification provision expressly states that contract changes can apply "to

2    claims that have accrued or are known to the employer," in which case the implied covenant

3    cannot be used to save the unilateral modification provision because that would "contradict the

4    express language" of the contract).  Under California law, then, the unilateral modification

5    provision in the Deposit Agreement would be given limited effect, thus preserving the existence of

6    the contract.

7           Under Texas law, if a contract contains a unilateral modification provision and is silent on

8    whether that clause allows for retroactive application, the contract's silence is construed as

9    permitting retroactive application.  *See Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206-07

10   (5th Cir. 2012) (citing cases "in which silence about the possible retroactive application of

11   amendments to the arbitration policy was interpreted to allow amendments to apply

12   retroactively").  Although Texas law thus differs from California law in this regard, Texas law

13   ultimately reaches the same conclusion as California law – *i.e.*, that such retroactivity does not

14   vitiate contract formation.  Under Texas law, where a contract contains a unilateral modification

15   provision, that provision in and of itself does not mean that a contract was never formed in the first

16   instance because "the rest of the parties' agreement provides the [requisite] consideration."  *In re*

17   *AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005); *cf.* Farnsworth on Contracts § 2.13,

18   n.1 (4th ed.) (stating that, "if a party has made more than one return promise, the fact that one of

19   them is illusory is not fatal to the enforceability of the other party's promise unless all of the return

20   promises are illusory").  Therefore, in the instant case, the unilateral modification provision in the

21   Deposit Agreement by itself would not mean that a contract had never been formed.

22          Because the contract at issue is not rendered unenforceable by the unilateral modification

23   clause under both Texas and California law, there is no material difference in result with respect to

24   the application of either state's law to this case.  Accordingly, the Court need not proceed with the

25   remainder of the governmental interest test and may simply apply California law.  *See Paulsen v.*

26   *CNF, Inc.*, 559 F.3d 1061, 1081 (9th Cir. 2009) (applying California law, as action was brought in

27   California forum, where California and Oregon law did not differ).  As discussed above, under

28   California law on contract formation, there is a formed contract in spite of the unilateral

                                              10

modification provision in the Deposit Agreement because the implied covenant of good faith and fair dealing would prevent USAA from retroactively applying contract changes to a customer claim that had already accrued.

## C.   Contract Validity

Having determined that a contract was formed between the parties, the Court now turns to the heart of the issue: whether Ms. Eiess must be compelled to arbitrate her claims. Ms. Eiess argues that, regardless of the arbitration provision in the Deposit Agreement, she cannot be compelled to arbitrate because the agreement to arbitrate is invalid under state law. *See* 9 U.S.C. § 2 (providing that, under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); *Sakkab*, 803 F.3d at 432 (stating that "[t]he final clause of § 2, its saving clause, permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue") (internal quotation marks omitted).

### 1.   Delegability of Contract Validity to Arbitrator

According to USAA, even if contract formation cannot be delegated to the arbitrator, contract validity clearly can be; thus, all of Ms. Eiess's arguments of contract invalidity must be decided in the first instance by the arbitrator given the arbitration provision's incorporation by reference of JAMS and/or AAA's rules.

As noted above, in order for there to be delegation, the parties must have clearly and unmistakably delegated gateway questions of arbitrability to the arbitrator. *See Rent-A-Center W., Inc., v. Jackson*, 561 U.S. 63, 79 (2010); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995) (noting that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide"). In the instant case, the Court finds that there was not was a clear and unmistakable delegation, based on incorporation by reference of

11

the JAMS and/or AAA rules, where the consumer who is party to the USAA agreement is not sophisticated.

The issue of whether the sophistication of the contracting parties should be taken into account in evaluating whether a delegation to an arbitrator is clear and unmistakable is an open one in the Ninth Circuit. In *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015), where the Ninth Circuit held that an incorporation by reference did amount to a clear and unmistakable delegation, the court noted that its "holding today should not be interpreted to *require* that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent." *Id.* at 1130 (emphasis added). The Ninth Circuit also stated that "our holding does not foreclose the possibility that this rule *could* also apply to unsophisticated parties or to consumer contracts." *Id.* (emphasis added; pointing out that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts"). Nevertheless, ultimately, the Ninth Circuit "limit[ed] [its] holding to the facts of the present case, which do involve an arbitration agreement 'between sophisticated parties.'" *Id.* at 1131.

In the wake of *Brennan*, there has been a split among the district courts in the Ninth Circuit as to whether the sophistication of the parties is a relevant consideration in determining whether incorporation by reference of arbitration rules amounts to a clear and unmistakable delegation. *Compare, e.g.*, *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 991-92 (N.D. Cal. 2017) (incorporation by reference of AAA rules amounted to clear and unmistakable delegation even when one party was unsophisticated), *with Ingalls v. Spotify USA, Inc.*, No. C 16-03533 WHA, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016) (incorporation of AAA rules into agreement to arbitrate did not clearly and unmistakably delegate gateway questions of arbitrability because unsophisticated parties to an arbitration agreement "could not be expected to appreciate the significance of incorporation of the AAA rules"). However, the majority of the lower courts in the Ninth Circuit have "held that incorporation of the AAA rules was insufficient to establish

12

delegation in consumer contracts involving at least one unsophisticated party." *Ingalls*, 2016 WL 6679561, at *4; *see also Money Mailer, LLC v. Brewer*, No. 15-1215, 2016 WL 1393492, at *2 (W.D. Wash. Apr. 8, 2016); *Galilea, LLC v. AGCS Marine Ins. Co.*, No. 15-0084, 2016 WL 1328920, at *3 (D. Mont. Apr. 5, 2016), *overruled on other grounds by* 879 F.3d 1052, 1062 (9th Cir. 2018) (holding that district court erred in considering owners of yacht and financial services company to be unsophisticated parties); *Vargas v. Delivery Outsourcing, LLC*, No. 15-03408, 2016 WL 946112, at *8 (N.D. Cal. Mar. 14, 2016); *Aviles v. Quik Pick Express, LLC*, No. 15-5214, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015), *vacated on other grounds* by 703 Fed. Appx. 631, 632 (9th Cir. 2017) (noting that question of whether sophistication of parties was relevant to a delegation analysis was open in the circuit); *Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. 2015).

The Court agrees with the majority of district courts in the Ninth Circuit. Although incorporation by reference may fairly be deemed a clear and unmistakable delegation where there are sophisticated parties, a different result may obtain where one party is unsophisticated. For an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity – a question the Supreme Court itself has deemed "'rather arcane.'" *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *10-13 (stating, *inter alia*, that "the arbitration provision contains no express delegation language, and its mention of the 'rules and auspices' of the AAA creates multiple ambiguities about which rules ultimately apply[;] [t]his language forces a customer to comprehend the import of the 'rules and auspices' of the AAA; locate those rules independently; determine that the AAA's Commercial Rules apply by operation of Rule R-1(a); and then specifically identify Rule R-7(a) to learn of the delegation provision"); *see also First Options*, 514 U.S. at 945.

These district court decisions that consider the parties' sophistication are in keeping with the general presumption against delegation of gateway questions of arbitrability to the arbitrator. The delegation must be clear and unmistakable. *See Portland GE*, 862 F.3d at 985. If that clarity

must obtain in the substantive wording of an arbitration clause, it seems logical that such clarity must obtain as a matter of form and procedure as well. It is noteworthy that, in other situations involving consumer contracts, courts have required contractual terms to be of a sufficiently conspicuous form in order to bind a consumer. *See, e.g.*, *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 836 (9th Cir. 2002) (holding that fine print of cruise ship ticket was sufficiently conspicuous as to provide notice to consumer of its terms when relevant portion of ticket was labelled as a contract, headings of contract were legible, and consumers were directed to read relevant sections limiting carrier's liability five times in an "important notice")[7]; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2014) (stating that, "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on – without more – is insufficient to give rise to constructive notice").

---

[7] In *Wallis*, the Ninth Circuit considered whether a limitation-of-liability provision in a passage contract between an individual and a cruise was enforceable. The provision limited the cruise's liability to the amount prescribed by the "Convention Relating to the Carriage of Passengers and Their Luggage by Sea" (also known as the Athens Convention). The plaintiff argued that the passage contract's incorporation of the Athens Convention was unenforceable cause, *inter alia*, it did not reasonably communicate the limitation of liability. *See Wallis*, 306 F.3d at 834.

The Ninth Circuit stated that, in evaluating reasonable notice, a court should consider (1) the ticket itself as well as (2) extrinsic factors indicating the passenger's ability to become meaningfully informed of the contractual terms at stake. *See id.* at 835. In *Wallis* itself, "the physical characteristics of the ticket . . . are such that the terms and conditions are sufficiently conspicuous to the passenger." *Id.* at 836. However, the Ninth Circuit ultimately held that the limitation-of-liability provision as not enforceable based on the second prong.

> We are persuaded that the average passenger has little incentive to invest sufficient effort to approximate the value of what she would be led to regard (by the language of paragraph 16 itself) as only a potentially binding term of the Passage Contract. . . . Moreover, even if a passenger were motivated to undertake such effort, *it would require some legal and financial sophistication*, which are additional extrinsic factors, to research the liability limitation reference in paragraph 16. For this reason, we hold that Princess' incorporation of the Athens Convention liability limitation does not satisfy the second prong of the reasonable communicativeness test.

*Id.* (emphasis added). Thus, even in *Wallis*, sophistication of the plaintiff was a consideration for the court.

Accordingly, the Court rejects USAA's argument that contract validity must be delegated to the arbitrator to decide in the first instance. USAA has failed to make a sufficient showing that Ms. Eiess clearly and unmistakably agreed to delegation, particularly in the absence of any evidence that she possesses a heightened level of sophistication.

### 2. Choice of Law on Contract Validity

Turning to the merits of Ms. Eiess's argument that arbitration clause in the Deposit Agreement is invalid, the Court must first decide which state's law on validity is applicable. *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (stating that, "[b]efore a federal court may apply state law-principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply"). It makes this determination using the choice-of-law rules of the forum state, which in this case is California." *Id.* "Under California law, the choice-of-law rules differ depending on whether the parties have included a choice-of-law agreement in their contract . . . ." *Id.*

Here, there is no dispute that the Deposit Agreement does have a choice-of-law clause, providing that Texas law applies. *See* FAC, Ex. A (Deposit Agreement at 5) ("Your account and this Agreement shall be governed by federal laws and . . . , to the extent that local law applies, by the laws of the state of Texas"). Where a contract includes a choice-of-law provision, California courts follow the approach laid out in Restatement (Second) Conflict of Laws § 187 and inquire (1) "whether the chosen state [in the choice-of-law provision] has a substantial relationship to the parties or their transaction," or (2) "whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 466 (1992). If either of the two tests is satisfied, California courts enforce the choice of law clause unless the other state's law is contrary to a fundamental policy of California and California has a "materially greater interest than the chosen state in the determination of the particular issue." *Id.* (quoting Restatement (Second) Conflict of Laws § 187). "California requires the court to conduct a separate choice-of-law analysis with respect to each issue in a case." *Brazil v. Dell, Inc.* 585 F. Supp. 2d 1158, 1162

(N.D. Cal. 2008) (citing *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 920 (2001)).[8]

a.    Contract and Unjust Enrichment Claims

The Court considers first the choice of law for Ms. Eiess's contract and unjust enrichment claims.

Both parties seem to agree that Texas has a substantial relationship to USAA and the transactions at issue: USAA is headquartered in Texas, and the Deposit Agreement defines the date of deposit of funds, among other financial services, as when the funds are processed in USAA's San Antonio headquarters.  Because the parties are in agreement and there does appear to be a substantial relationship, the first part of the *Nedlloyd* test is satisfied.  *See Brack v. Omni Loan Co., Ltd.*, 164 Cal. App. 4th 1312, 1325 (2008) (finding substantial relationship with Nevada when defendant lender was a Nevada corporation, was headquartered in Nevada, and approved loans in Nevada).

Next, the inquiry turns to whether the enforcement of Texas law would be contrary to a fundamental policy of the state of California, and whether California has a materially greater interest than Texas in the issue at hand.  *See Delisle v. Speedy Cash*, No. 18-cv-2042-GPC-RBB, 2019 WL 2423090, at *4 (S.D. Cal. June 10, 2019).  Here, Ms. Eiess fails to identify a policy, let alone a fundamental policy, of California that would be violated if Texas law were to apply to the contract and unjust enrichment claims.  Since no fundamental policy has been identified, Texas law applies.

Ms. Eiess asserts still that, under Texas law, the agreement to arbitrate the contract and unjust enrichment claims is invalid because the agreement to arbitrate is illusory.  Under Texas law, an agreement to arbitrate supported by an underlying contract may rely on the consideration used for the broader contract.  However, "such an arbitration provision remains illusory if the

---

[8] The Court notes that, in *Washington Mutual*, the court was not applying the *Nedlloyd* choice-of-law analysis (applicable where there is a choice-of-law provision in a contract) but rather the general governmental interest choice-of-law analysis.  However, nothing indicates that the point that *Washington Mutual* made – *i.e.*, "a separate conflict of laws inquiry must be made with respect to each issue in the case," *Wash. Mut.*, 24 Cal. 4th at 920, would not have applicability where the *Nedlloyd* choice-of-law analysis applies.  *Cf. Nedlloyd*, 3 Cal. 4th at 471 (applying contractual choice-of-law test for each distinct issue).

contract permits one party to legitimately avoid its promise to arbitrate, such as by unilaterally amending or terminating the arbitration provision and completely escaping arbitration." *Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W.3d 494, 505 (Tex. 2015). In those situations, like this one, arguments that an arbitration agreement is illusory go to the validity of the arbitration agreement, rather than its formation. *See Arnold*, 890 F.3d at 551 (citing *J.M. Davidson v. Webster*, 128 S.W.3d 223 (Tex. 2003)).

Here, Ms. Eiess once again relies on the unilateral modification provision in the Deposit Agreement, which she argues allows USAA to retroactively alter the agreement to arbitrate. The main case on which Ms. Eiess relies is *Carey*, 669 F.3d at 202. In *Carey*, the Fifth Circuit held that an arbitration agreement was illusory because of a change-of-terms clause that allowed the defendant employer to retroactively modify the terms of the plaintiff's employment and thus escape arbitration altogether. *See id.* at 206-07. The court held that such a change-in-terms provision rendered the arbitration agreement illusory because under Texas law, "silence about the possible retroactive application of amendments to the arbitration policy was interpreted to allow amendments to apply retroactively." *Id.* at 206-07. Retroactive application of an amendment to the arbitration policy could allow an employer to "suddenly change the terms of the agreement to avoid arbitration" and "strip the right of arbitration from an employee who has already attempted to invoke it." *Id.* at 205. The court noted that for such a provision to not be considered illusory, a "savings clause" must explicitly prohibit unilateral modifications from applying retroactively. *Id.* at 206; *see also In re Halliburton*, 80 S.W.3d at 570 (Tex. 2002) (finding employer's promise to arbitrate disputes was not illusory because while employer could unilaterally modify or discontinue its arbitration agreement, the agreement's savings clause prevented modification or termination from applying to disputes that employer had actual notice of prior to amendment).

In response, USAA acknowledges *Carey* but argues that the rule it articulates is preempted by the FAA because it is unique to cases where "a contract to arbitrate is at issue." *Perry v. Thomas*, 482 U.S. 483 n.9 (1987); *see Ramirez v. 24 Hour Fitness USA, Inc.*, 549 F. App'x 262, 263 (5th Cir. 2013) (noting that *Carey*'s holding is "arbitration-specific"). The Court agrees with USAA and finds the *Carey* line of cases preempted by the FAA. *See AT&T Mobility LLC v.*

17

United States District Court
Northern District of California

*Concepcion*, 563 U.S. 333, 339 (2011) (holding that FAA's saving clause does not apply to defenses that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue"). As the Fifth Circuit recognized in *Ramirez*, *Carey* and the line of Texas law on which it relies expressly address only the issue of "whether arbitration agreements are illusory," rather than whether *all* contracts that contain unilateral modification provisions silent as to retroactive effect are illusory. *See, e.g., Carey*, 669 F.3d at 205 (stating that, if a party "can suddenly change the terms of the agreement to avoid *arbitration*, then the agreement was illusory from the outset") (emphasis added); *Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) (same); *J.M. Davidson v. Webster*, 128 S.W.3d 223 (Tex. 2003) (same); *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70 (1st Cir. 2018) (applying Texas law); *Torres v. S.G.E. Mgmt., LLC*, 397 Fed. Appx. 63 (5th Cir.2010).

It thus appears that the rule in *Carey* singles out arbitration for special treatment. Indeed, Texas courts seem to have given effect to unilateral modification provisions that do not involve arbitration. *See Brand v. Chase Bank USA, N.A.*, No. 05-15-00066-CV, 2016 WL 3574066, at *4 (Tex. Ct. App. July 1, 2016) (concluding that plaintiff could not allege breach of contract due to defendant's unilateral modification of contract because plaintiff did not "cite any provision in the contract that prevented [defendant] from making those changes").

Because, under current Texas law, *Carey*'s holding must be deemed to have "derived [its] meaning from the fact that an agreement to arbitrate is at issue," Ms. Eiess's argument fails and arbitration of the claims for breach of contract and unjust enrichment must be compelled. *Concepcion*, 563 U.S. at 339.

### b. Statutory Claims

For Ms. Eiess's UCL and CLRA claims, the first part of the *Nedlloyd* test is satisfied for the same reasons as stated above – *i.e.*, Texas has a substantial relationship to USAA and the transactions at issue because USAA is headquartered in Texas, and the Deposit Agreement defines the date of deposit of funds as when the funds are processed in USAA's San Antonio headquarters. The Court therefore must enforce the Texas choice of law in the Deposit Agreement unless Texas law is contrary to a fundamental policy of California and California has a materially

18

greater interest than Texas on the specific issue under consideration.

Ms. Eiess argues that Texas law is contrary to a fundamental policy of California because, in California, there is the *McGill* rule which provides that a waiver in a contract of a claim for public injunctive relief in any forum (*i.e.*, judicial or arbitral) is not enforceable, *see McGill*, 2 Cal. 5th at 961; in contrast, Texas has no such rule.[9]  In response, USAA does not dispute that Texas does not have a rule comparable to *McGill*.  However, it does argue that the *McGill* rule is irrelevant because it applies only where a plaintiff is seeking public injunctive relief and, here, Ms. Eiess is not asking for such.[10]

The Court does not agree.  In *McGill*, the plaintiff had opened a credit card account with Citibank and purchased from it a credit protector plan under which Citibank agreed to defer or credit certain amounts on her credit card account when certain qualifying events took place (*e.g.*, long-term disability, unemployment).  The plaintiff submitted a claim to Citibank under the plan after she lost her job.  She later filed suit against Citibank based on its marketing of the plan and its handling of her claim.  For relief, the plaintiff asked, *inter alia*, for "an order requiring Citibank 'to immediately cease [its] acts of unfair competition and enjoining [Citibank] from continuing to conduct business via the unlawful, fraudulent or unfair business acts and practices complained of . . . and from failing to fully disclose the true nature of its misrepresentations.'"  *McGill*, 2 Cal. 5th at 957.  The California Supreme Court explained that "public injunctive relief" is "relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten injury to the general public," whereas private injunctive relief is "[r]elief that primarily 'resolve[s] a private dispute' between the parties . . . and rectifies individual wrongs . . . and that benefits the public, if at all, only incidentally."  *Id.* at 955; *see also Blair*, 928 F.3d at 831 n.3 ("[Defendant] alternatively

---

[9] Texas and California law may also differ because Texas may not allow public injunctive relief when there is a violation of a consumer protection statute.  *See David McDavid Pontiac, Inc. v. Nix*, 681 S.W. 2d 831, 839 (Tex. Ct. App. 1984) (denying request for injunction that would enjoin defendant from engaging in several deceptive business practices in the future because "the relief sought is designed to punish [defendant] for the manner in which it dealt with [plaintiff]," and "injunctive relief is designed to deter, not to punish.")

[10] As indicated above, because of the recent Ninth Circuit decision in *Blair*, USAA no longer makes an argument that the *McGill* rule is preempted by the FAA.

argues that the *McGill* rule does not apply because [Plaintiff's] requested relief does not amount to a public injunction. Not so. [Plaintiff] seeks to enjoin future violations of California's consumer protection statutes, relief oriented to and for the benefit of the general public.").

Under *McGill*, Ms. Eiess is clearly seeking public injunctive relief. In the FAC, she has asked the Court to enjoin USAA from future violations of California consumer protection statutes by forcing USAA to amend its Deposit Agreement (which is available to the public to review) to better reflect its actual practices of charging multiple NSF Fees. *See* FAC ¶¶ 103, 119 (for UCL and CLRA claims, seeking to enjoin USAA from "misrepresenting and omitting material information concerning its NSF Fee policy," to protect herself, other accountholders, and the general public from USAA's conduct"). The relief sought transcends her personal situation and relief. None of USAA's arguments to the contrary are persuasive.

For example, USAA suggests that Ms. Eiess lacks standing to bring her claims for public injunctive relief. But Ms. Eiess has standing to seek public injunctive relief because she has adequately alleged injury-in-fact under current Ninth Circuit law. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018) (stating that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an "actual and imminent, not conjectural or hypothetical" threat of future harm"); *see also Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 531 (N.D. Cal. 2018) (noting that plaintiff can establish standing for injunctive relief claims if she alleges that "she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to"). Ms. Eiess remains a USAA customer and nothing indicates that she wants to stop being a customer. She thus has standing under *Davidson*. USAA's reliance on *McGovern v. United States Bank N.A.*, 362 F. Supp. 3d 850 (S.D. Cal. 2019), is not persuasive, especially as *McGill* demonstrates that a plaintiff may seek public injunctive relief against a financial services company for misrepresenting its policies even if she might also benefit from such relief.

Similarly, the Court does not find persuasive the Central District cases on which USAA

20

relies that take a narrow definition of public injunctive relief because those cases do not address the fact that *McGill* allowed public injunctive relief in a very similar situation to the case at bar. *See Johnson v. JP Morgan Chase Bank, N.A.*, No. EDCV 17-2477 JGB, 2018 WL 4726042, at *6 (C.D. Cal. Sept. 18, 2018); *Rappley v. Portfolio Recovery Assocs., LLC*, No. EDCV 17-108 JGB, 2017 WL 3835259, at *6 (C.D. Cal. Aug. 24, 2017); *Wright v. Sirius XM Radio, Inc.*, No. SACV 16-1688 JVS, 2017 WL 4676580, at *9 (C.D. Cal. June 1, 2017).

Finally, USAA attempts to argue that the remedy of public injunctive relief is inapplicable in the instant case because its services are offered to a subset of the general public – those who have served in the military or are related to servicemembers who qualify for USAA's services – and therefore any injunctive relief could never be for the benefit of the general "public." USAA cites to no California court decision holding that, if all members of the public are not potentially affected, then the injunction is not "public." Indeed, such a position would seem untenable; for example, simply because relief in a given case were designed to protect a subset of the general public – such as children, the elderly, women, or non-English speakers – such relief would hardly be deemed "nonpublic" in nature. Moreover, USAA's argument provides no guiding principle for a court to decide when a group of potentially affected individuals is sufficiently small to preclude "public" injunctive relief.

Ms. Eiess is seeking public injunctive relief under *McGill*. The only issue that remains is the final step of the *Nedlloyd* test – *i.e.*, whether California has a materially greater interest than Texas in respect thereto. *See Nedlloyd*, 3 Cal. 4th at 466.

USAA argues that Texas has a greater interest in having its law applied because USAA is headquartered in Texas and a significant part of the Deposit Agreement is to be performed in Texas. Additionally, USAA contends that California has a weak interest in the matter because Ms. Eiess has not shown that she was a California resident at the time she entered into the deposit agreement and USAA has no California locations.

However, USAA overlooks that, in this specific inquiry, the Court analyzes each state's interest in Ms. Eiess's statutory consumer protection claims. Ms. Eiess alleges that she was injured by USAA's misrepresentations in violation of the UCL and CLRA and that such

misrepresentations were made to her while she was a California resident.[11]  California has a strong "interest in protecting its consumers through its chosen mechanisms,"  *Lloyd v. Navy Fed. Credit Union*, No. 17-cv-1280-BAS-RBB, 2018 WL 1757609, at *6 (S.D. Cal. Apr. 12, 2018), and "California's own anti-deception statutes take priority, at least in a California forum," when it comes to out-of-state banks and their interactions with California consumers.  *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1361 (N.D. Cal. 2007); *cf. Weshba v. Apple Comp., Inc.*, 91 Cal. App. 4th 224, 242 (2001) (noting that California's consumer protection laws have been recognized as "among the strongest in the country").  Therefore, any interest Texas may have in the adjudication of Ms. Eiess's statutory claims due to USAA's Texas roots is outweighed by California's specific interest in protecting its consumers and their relationships with out-of-state banks embodied in California's anti-deception laws.  *See, e.g.*, *Walter v. Hughes Communs., Inc.*, 682 F. Supp. 2d 1031, 1042 (N.D. Cal. 2010) ("California has a stronger interest in protecting its consumers through its chosen mechanisms – a statutory scheme that permits its injured consumers not only to bring class actions to recover their losses, but also to seek punitive damages and injunctive relief in order to deter and prevent future harm to other consumers located in the state.").

    Accordingly, the Court holds that, because Texas does not have a rule comparable to *McGill* and because California has a materially greater interest than Texas, California law applies to Ms. Eiess's claims for public injunctive relief, a remedy sought for her UCL and CLRA causes of action.  Under *McGill*, the agreement to arbitrate is invalid to the extent it waives claims for public injunctive relief in any forum.  Thus, the Court denies the motion to compel arbitrate Ms. Eiess's claims for injunctive relief.  These claims must be litigated and not arbitrated.  *See* FAC, Ex. A (Deposit Agreement at 33) (providing that "[t]he arbitrator shall be restricted to resolving only the Covered Claims between you and FSB" and that, "[i]f one or more of the above limitations on proceedings and other rights is determined to be unenforceable or interpreted to not prevent a collective or class action, then such collective or class action shall proceed in a court of

---

[11] Ms. Eiess's relationship with USAA is governed by a 2016 amendment of the Deposit Agreement.  Ms. Eiess has been a California resident since 2014.  *See* FAC ¶ 6.

law and not in arbitration").

The Court notes, however, that this does not mean that the entirety of Ms. Eiess's UCL and CLRA claims are to be litigated. These claims may be litigated in court only to the extent Ms. Eiess is seeking public injunctive relief (*i.e.*, enjoining USAA from misrepresenting its NSF Fee policy). Notably, Ms. Eiess is also asking for monetary relief with respect to these claims (damages and/or restitution). *See* FAC ¶¶ 102, 118 (for UCL and CLRA claims, alleging that "Plaintiff and members of the California Subclass have paid, and/or will continue to pay NSF Fees and thereby have suffered and will continue to suffer actual damages"). The claims for monetary relief are subject to arbitration because the *McGill* rule does not apply to these claims, and Ms. Eiess has failed to provide any other argument as to why the monetary claims should not be arbitrated.

### 3. Stay of Proceedings

For the reasons stated above, the Court concludes that the contract and unjust enrichment claims must be arbitrated, as well as Ms. Eiess's UCL and CLRA claims to the extent she seeks monetary relief. However, to the extent Ms. Eiess seeks public injunctive relief as a remedy for a violation of the UCL and CLRA, those claims must be litigated in court.

The final issue for the Court to resolve is whether to stay litigation on the claims for public injunctive relief pending the resolution of the arbitration. In deciding whether a stay is warranted, the Court takes some guidance from *Landis v. North American Co.*, 299 U.S. 248 (1936). *See Levya v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) (citing, *inter alia*, *Landis* in support of the statement that "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case[;] [t]his rule applies whether the separate proceedings are judicial, administrative, *or arbitral in character*, and does not require that the issues in such proceedings are necessarily controlling of the action before the court") (emphasis added). Under *Landis*, a court considers the following in determining whether a stay is appropriate:

[1] [T]he possible damage which may result from the granting of a

> stay, [2] the hardship or inequity which a party may suffer in being
> required to go forward, and [3] the orderly course of justice
> measured in terms of the simplifying or complicating of issues,
> proof, and questions of law which could be expected to result from a
> stay.

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005) (quoting *CMAX, Inc. v. Hall*, 300

F.2d 265, 268 (9th Cir. 1962)).

In the instant case, the first two *Landis* factors are countervailing. Ms. Eiess has an interest

in seeing her claims for public injunctive relief litigated promptly to prevent future injury to

consumers and so she may trust USAA's representations in the future. However, the importance

of prospective relief and the harm from its delayed adjudication if the proceeding were stayed

pending arbitration is mitigated by the following: (1) a relatively small sum of money per

consumer is at issue; (2) there is no suggestion that public health or safety or any other time-

sensitive irreparable injury to the public is at stake; and (3) the delay will be short if individualized

non-class arbitration proceeds promptly and expeditiously. As for USAA's interests, it stands to

lose the benefit of what it bargained for in the Deposit Agreement if litigation were to go forward

– namely, the comparative efficiency and streamlined nature of arbitration proceedings. As to the

third *Landis* factor, staying proceedings in this forum pending the conclusion of arbitration may

simplify the issues, proof, and questions of law for this Court.

Therefore, while a close call, the Court shall stay proceedings in this matter pending the

conclusion of arbitration of USAA's liability under the UCL and CLRA, at which point it shall

revisit Ms. Eiess's request for public injunctive relief. *Accord Dornaus v. Best Buy Co., Inc.*, No.

18-cv-04085-PJH, 2019 WL 632957, at *6 (N.D. Cal. Feb. 14 2019) (staying plaintiff's claim for

public injunctive relief until the conclusion of arbitration because "all issues other than the

potential award of public injunctive relief are subject to arbitration and will predominate over the

relatively narrow issues concerning the propriety and scope of a public injunctive relief award").

Should this arbitration not proceed expeditiously, this Court will be open to reconsidering the stay.

### III.     CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part USAA's motion to

compel arbitration. More specifically, the motion to compel is granted with respect to the claims

for breach of contract and unjust enrichment in their entirety, as well as the claims under the UCL and CLRA on the questions of liability and monetary relief.  However, the Court finds that the arbitration agreement contains an impermissible waiver of Ms. Eiess's right to seek public injunctive relief in any forum and thus denies the motion to compel on that limited claim for relief only.  The Court stays litigation on the claim for public injunctive relief pending the arbitration which the Court presumes will proceed expeditiously.  Upon completion of arbitration, Ms. Eiess may ask for a lift of the stay and further proceedings as appropriate.

This order disposes of Docket No. 32.


**IT IS SO ORDERED**.


Dated: August 23, 2019


_____
EDWARD M. CHEN
United States District Judge